**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES L. KOPECKY, RECEIVER FOR BRAD A. WEAVER AND BETA ASSET MANAGEMENT, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 08 C 4921 |
| RJM INVESTMENTS, MARK VEHSLAGE, JON WITHEY, AND RICHARD SCHRIPSEMA | ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

From January 2003 through December 2004, Brad Weaver solicited investors for Beta Asset Management, Inc. ("Beta Asset Management"), a company he characterized as an "error accounts" investment fund, but which he in fact used to perpetrate a Ponzi scheme. Weaver was convicted of securities fraud, and the court appointed James L. Kopecky as the receiver (hereinafter "Receiver") for Beta. *Securities and Exchange Commission v. Weaver*, No. 04 C 8279 (N.D. Ill. Dec. 23, 2004). In this and several other cases, the Receiver has sued to recover so-called profits reaped by early "investors" in Beta at the expense of many later "investors" in the scheme, who lost much or all of the sums they entrusted to Weaver.

This lawsuit is one of three filed by the Receiver in an effort to trace $2.6 million in profits distributed by Weaver to Lakewood Properties, Ltd ("Lakewood Properties"). Lakewood was an Illinois company formed by Mark Vehslage and Richard Schripsema; the $2.6 million was ultimately conveyed to Vehslage and Schripsema through a partnership they formed with Defendant Jon Withey ("Defendant") called RJM Investments ("RJM"). The Receiver has settled his claims against Vehslage and Schripsema but continues to pursue this action against RJM and its remaining founding partner, Withey. Withey has moved to dismiss, arguing that the Receiver's complaint fails to state a claim for relief against him. For the reasons set forth here, Defendant's motion is denied.

**FACTUAL BACKGROUND**

The following facts are drawn from the Plaintiff's Complaint and presumed to be true for the purposes of this motion. Between January 2003 and December 2004, Weaver operated Beta Asset Management, a purported investment fund which Weaver used to defraud more than 100 investors of some $22 million. (Compl. ¶ 12.) Weaver secured investments by making fraudulent representations as to his ability to trade in "error accounts."[1] *Id.* As is characteristic of Ponzi schemes, early investors profited from illegitimate returns on their investments through Weaver's fraudulent redirection of money paid by subsequent investors. (Compl. ¶ 13.)

On June 4, 2004, Beta Asset Management received a wire transfer of $3 million from an investor. (Compl. ¶ 14.) Later that same day, Weaver transferred $2.6 million from Beta Asset Management to Chicago Title & Trust for the benefit of Lakewood Properties and without receiving valid consideration in exchange. (Compl. ¶ 21.) Lakewood Properties, an Illinois corporation formed by Vehslage and Schripsema for the stated purpose of making real estate investments, was in fact a shell company used to fraudulently funnel Beta Asset Management funds to other entities controlled by Vehslage and Schripsema. (Compl. ¶ ¶ 11, 19-28.) Defendant Withey, an Illinois resident, served as accountant and tax advisor for Lakewood Properties during this period. (Compl. ¶ 8.) On the same day that Lakewood Properties received the $2.6 million transfer from Beta Asset Management, and for no valid consideration, Vehslage wired $2.6 million from the Lakewood Properties account at Chicago Title & Trust to a personal account of his own at Northern Trust

---

[1] In the course of investing it is almost impossible to avoid occasional trading errors. The SEC provides little guidance on how to repair such errors, but one method is to establish an account for the temporary placement of funds involved in a financial transaction known to have been executed in error. There is no single method of calculating the gain, loss, or compensation due to the fund or account; these determinations will depend heavily on the specific facts. *See* "Advisers Act–Correcting Trading Errors," Regulation of Inv. Advisers § 2:156. The court is uncertain whether there is any legitimate method of investing or trading in "error accounts," but it is undisputed that Weaver's enterprise was no more than a Ponzi scheme.

Company. (Compl. ¶ 22.)

On May 14, 2004, Vehslage, Schripsema and Withey had formed RJM, an investment partnership they used to pool assets for the purpose of making investments through an E*Trade account. (Compl. ¶ 20.) RJM's E*Trade account opened on June 22, 2004 with an initial deposit of $1000 from Withey. (Compl. ¶ 24.) Between July 2004 and July 2005, Vehslage and Schripsema deposited more than $3.7 million into the E*Trade account, including the $2.6 million of Beta Asset Management funds that Vehslage wired to himself on June 4, 2004. (Compl. ¶¶ 25, 27.) The Receiver concedes that at this time, he has no reason to believe that Withey deposited any more money into the account after his initial contribution of $1000. (Compl. ¶ 24.) Between April 2005 and May 2008, "the principals of RJM Investments withdrew or used" more than $3 million from the E*Trade account; as of May 31, 2008, the account balance stood at $984,786.44. (Compl. ¶ 26.)

The Receiver alleges that Withey, as a founding partner in RJM, received a profit of more than $3 million from Beta Asset Management (Compl. ¶ 30); that Withey's retention of any and all proceeds from the Ponzi scheme comes at the expense of defrauded investors in violation of fundamental equitable principles (Compl. ¶ 32); and that the transfers from Beta Asset Management to RJM, through intermediary accounts, constituted either direct fraudulent conveyances or subsequent fraudulent conveyances for no reasonably equivalent value. (Compl. ¶¶ 34, 36.) The Receiver has alleged claims for unjust enrichment (Count I) and violations of Illinois' Uniform Fraudulent Transfer Act ("IUFTA") (Count II). This court has jurisdiction pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and Section 27 of the Exchange Act, 15 U.S.C. § 78a. Supplemental jurisdiction over the Illinois state law claim is proper under 28 U.S.C. § 1367.

## DISCUSSION

A motion to dismiss under Rule12(b)(6) tests the sufficiency, not the merits, of the plaintiff's claim. FED. R. CIV. P. 12(b)(6); *see Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a motion to dismiss under federal notice pleading standards, a plaintiff must "provide the

grounds of his entitlement to relief" by alleging "enough to raise a right to relief above the speculative level" and to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Nor will a pleading suffice if it provides "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. The court will, however, accept as true all well-pleaded allegations in the complaint and draw any reasonable inferences therefrom in the plaintiff's favor. *Disability Rights Wisc., Inc. v. Walworth County Bd. of Supervisors,* 522 F.3d 796, 799 (7th Cir. 2008).

**A.      Unjust Enrichment (Count I)**

To state a claim for unjust enrichment under Illinois law, the plaintiff must allege "that the defendant has unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989). The Supreme Court of Illinois has explained that the defendant's retention of a benefit is unjust under any of three conditions: (1) the benefit should have been given to the plaintiff but was mistakenly given to the defendant; (2) the defendant procured the benefit through wrongful conduct; or (3) the plaintiff simply has a better claim to the benefit than the defendant. *Id.* at 161-62, 545 N.E.2d at 679. Defendant asserts that Receiver has failed to plead facts sufficient to support his claim under any of these rationales. (Mot. to Dismiss [19], at 3.)

The Receiver's Complaint alleges that "Defendants Jon Withey, Mark Vehslage and Richard Schripsema are the partners of RJM Investments" (Compl. ¶ 7) and that "the $2.6 million transferred from Beta Asset Management . . . to Lakewood and then subsequently to Defendant Vehslage's personal account, along with the other monies that Lakewood, Defendant Vehslage, and Defendant Schripsema received, were used to fund RJM Investments' E*Trade account." (Compl ¶ 27.) The

Complaint further alleges that the RJM partners "unjustly received a profit of more than $3 million dollars as the result of the fraudulent financial scheme perpetrated by Weaver and Beta," that "Defendants were unjustly enriched to the detriment of the other investors in the fraudulent financial scheme," and finally, that the "retention of the proceeds of the fraudulent financial scheme violates fundamental principles of justice, equity and good conscience." (Compl. ¶¶ 30-32.)

Withey argues that RJM did not retain any benefit from the transfers because, as the Complaint alleges, "funds in excess of the $2.6 million at issue were withdrawn from the E*Trade account."[2] (Withey's Supplement [71], at 5.) That more than the amount at issue was ultimately withdrawn from the E*Trade account, however, has little bearing on whether RJM and its principals benefitted from funds fraudulently obtained by Weaver/Beta Asset Management. Nor is the court moved by Withey's assertion that the Receiver has not alleged a quantifiable benefit that RJM received and retained. (Withey's Reply in Support of Supplement [73], at 3.) Plaintiff has alleged that Vehslage and Schripsema received $2.6 million of Beta Asset Management money without giving valid consideration; funneled that money into the RJM investment account through several intermediaries and shell corporations; and then, in partnership with Withey, used those funds to make profitable investments via an account in RJM's name, ultimately profiting to the tune of some $3 million. (Compl. ¶¶ 21-22, 25-27, 30-32.) These allegations are sufficient to state a claim of unjust enrichment.

Withey further contends that the "Partnership Agreement" attached as Exhibit B to Receiver's Complaint absolves him of any liability because it provides that each partner's right to any benefits or funds held by RJM is directly proportional to his individual contributions. (Motion to Dismiss [19], at 6.) Relying on language of the Agreement, Defendant asserts that, having contributed no more than $1000 to the RJM accounts, he personally was entitled only to benefits

---

[2] RJM, as a partnership, is no longer moving to dismiss the complaint, the Receiver having settled separately with defendants Vehslage and Schripsema.

in proportion to that sum. *Id.* On this point, it is enough to note that, should Plaintiff prove that RJM was unjustly enriched, RJM's partners are jointly and severally liable for all debts and obligations of the partnership under Illinois law. *See* Illinois Uniform Partnership Act, 805 ILCS 206/306. Whatever defenses the Agreement might afford Withey in an action brought against him by his partners are of no relevance to claims brought against the partnership by a third party. In any event, the Receiver's allegation that Withey contributed only $1000 was based on no more than Withey's own representations. (Receiver's Response [41], at 5.) No discovery has been conducted to determine with any specificity Withey's contributions to, or benefit from, the E*Trade account. Defendant's actual individual contributions and profits are a matter for the discovery process, not a basis for dismissal of the Complaint.

**B.      Uniform Fraudulent Transfer (Count II)**

Under Illinois law, "'actual fraud' or 'fraud-in-fact' results where the 'debtor transfers property with the intent to hinder, delay, or defraud his creditors' while constructive fraud or 'fraud-in-law' 'occurs when (1) a voluntary gift is made, (2) there is an existing or contemplated indebtedness against the debtor, and (3) the debtor has failed to retain sufficient property to pay the indebtedness.'" *Wachovia Securities, LLC v. Neuhauser*, 528 F. Supp. 2d 834, 858 (N.D. Ill. 2007) (quoting *In re Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992)). Receiver alleges fraud-in-fact resulting "from the transfer of funds from Beta to and for the benefit of Lakewood and the Defendants personally." (Compl. ¶ 35.)

The IUFTA permits recovery of factually or constructively fraudulent conveyances of funds under certain circumstances. *See* 740 ILCS 160/1 *et seq.* Indeed, '[c]ourts have routinely applied [the Uniform Fraudulent Conveyance Act] to allow receivers . . . to recover monies lost by Ponzi-scheme investors." *Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008), citing *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). The Receiver alleges that "the transfer of funds from Beta

6

to Lakewood to Defendants Vehslage and Schripsema and used for the benefit of all Defendants in the E*Trade account constitutes either direct fraudulent conveyance or a subsequent fraudulent conveyance for no reasonably equivalent value under the Illinois Uniform Fraudulent Transfer Act." (Compl. ¶ 34.) Based on these allegations, the Receiver pleads three alternative grounds for relief under IUFTA, 740 160/5: (1) "Beta's transfer of funds to and for the benefit of Lakewood and the Defendants personally was done without Beta receiving reasonably equivalent value in exchange for the transfer or obligation;" (2) "Beta was engaged or was about to engage in a business or transaction for which the remaining assets of Beta were unreasonably small in relation to the business transaction;" and (3) "Beta intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due." (Compl. ¶ 36.) Defendant asserts that Count II should be dismissed because the Receiver has failed to allege that any money was transferred to Withey himself. (Motion to Dismiss [19].) Plaintiff has, however, alleged that Vehslage and Schripsema transferred $2.6 million in fraudulently obtained Beta funds to RJM's E*Trade account (Compl. ¶ 34) and, as explained earlier, under Illinois partnership law Withey is liable for any profits that the partnership received, regardless of whether or not he himself was enriched. Plaintiff has sufficiently pleaded a fraudulent conveyance claim against RJM under IUFTA.

Withey raises two additional arguments, but neither is persuasive. First, Withey contends that the Receiver has no right to relief against Withey because Withey "would have taken his transfer as a subsequent transferee of subsequent transferees, RJM, Schirpsema and Vehslage, who were the subsequent transferees of Lakewood Properties." (Withey's Supplement [71], at 6-9.) If this were true, any fraudulent transferee could evade the IUFTA and avoid penalty by routing his fraudulent transfers through various shell entities. The Receiver has alleged that Vehslage and Schripsema controlled both Lakewood Properties and RJM, with Withey serving as an accountant and tax advisor for the former and as a principal partner in the latter. (Compl. ¶¶ 8, 20.) The court

is satisfied that the Receiver has sufficiently alleged fraudulent transfers at the direction of the collective partners and for their collective benefit. (Compl. ¶¶ 27, 34-36.)

Finally, Withey suggests that even if RJM is a subsequent transferee, Withey himself cannot be liable because he had no dominion or control over the funds in the E*Trade account. Relying on *Bonded Services, Inc. v. European American Bank,* 838 F.2d 890 (7th.Cir. 1988), Withey suggests that RJM was merely a conduit through which Vehslage and Schripsema routed funds. (Withey's Supplement [71], at 9.) In *Bonded Services,* European American Bank accepted a transfer of $200,000 from the initial transferee, but had no relationship with the transferee other than as a borrower. RJM's E*Trade account, by contrast, was hardly a third-party "depository" from which "RJM realized no benefit": RJM and its principals allegedly exercised complete dominion over the account and used its funds for their personal financial gain. (Withey's Supplement [71], at 9.) (Compl. ¶¶ 26, 34.) The Receiver has alleged sufficiently that RJM and Withey received and exercised control over the $2.6 million in Beta Asset Management funds and benefitted from those funds. (Compl. ¶¶ 30, 34-36.)

## **CONCLUSION**

Defendant Withey's motion to dismiss [19] is denied. Withey is directed to file his answer within 21 days. A Rule 16 conference is set for Monday, September 28, 2009, at 9:00 a.m.

ENTER:

Dated: August 26, 2009

_____
REBECCA R. PALLMEYER
United States District Judge